## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

HYMOWITZ LAW GROUP, PLLC
*Attorneys for Plaintiffs Yuri (Uri) Kasparov*
*and Aleph Towers, LLC*
      1928 Kings Highway
      Brooklyn, NY 11229
      Tel: (718) 807-9900
      daniel@hymowitzlawgroup.com

ATTORNEY OF RECORD:
      Daniel Hymowitz (DH-0936)

| | |
|---|---|
| ALEPH TOWERS, LLC, YURI (URI) KASPAROV<br><br>          *Plaintiff,*<br><br>  – *against* –<br><br>AMBIT TEXAS, LLC, CHRIS CHAMBLESS,<br>STEVEN THOMPSON<br><br>          *Defendants.* | **VIA ECF**<br><br>Civil Action No.: **12-3488**<br>          (JG)(JO)<br><br>**AMENDED VERIFIED<br>COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiffs, Yuri (Uri) Kasparov ("Kasparov") and Aleph Towers, LLC ("Aleph"), complaining of the Defendants by and through their undersigned counsel, respectfully set forth and allege as follows:

## I. INTRODUCTION

1. This is an action seeking monetary damages and accrued interest that are already due and will become due in the future under a breached contract or in the alternative as a result of unjust enrichment and as a result of frauds committed by the defendants.

## II.   PARTIES

2.      Kasparov is a citizen of the State of New York domiciled at 85 Diamond Avenue, East Meadow, New York 11554.

3.      Aleph is a New York limited liability company with its principal place of business at 3939 Bedford Avenue, Brooklyn, New York 11229.

4.      Aleph has two members: Svetlana Gorbulsky and Yelena Ferdman.

5.      Svetlana Gorbulsky is a citizen of the State of New York domiciled at 3939 Bedford Avenue, Brooklyn, New York 11229.

6.      Yelena Ferdman is a citizen of the State of New York domiciled at 1866 Ocean Avenue, Apt. 7C, Brooklyn, New York 11230.

7.      Upon information and belief, Defendant Ambit Texas, LLC, is a Texas limited liability company with its principal place of business at 1801 North Lamar Street, Suite 200, Dallas, Texas 75202 ("Ambit").

8.      Upon information and belief, Ambit GenPar Inc is the sole member of Ambit Texas, LLC.

9.      Ambit GenPar Inc. is a corporation formed under the laws of the State of Texas having the principal place of business at 1801 North Lamar Street, Suite 200, Dallas, Texas 75202, and is a citizen of the State of Texas.

10.     Therefore, Ambit is a citizen of the State of Texas[1].

_____

[1] Initially, the sole member of Ambit Texas, LLC, was Ambit Energy, L.P.  The sole member of Ambit Energy, L.P., is Ambit GenPar, Inc.  Thus, upon merger of Ambit Texas, LLC., the surviving entity,

11.     Upon information and belief, Defendant Chris Chambless ("Chambless") is a citizen of the state of Texas domiciled at 6035 Park Lane, Dallas, Texas 75225.

12.     At all relevant times, Chambless was a co-founder and chief marketing officer of Ambit.

13.     Upon information and belief, Defendant Steven Thompson ("Thompson") is a citizen of the state of Texas domiciled at 1401 Possum Trot Street, Austin, Texas 78703.

14.     Thompson was one of the first consultants building Ambit's business and is one of the top earning consultants in Ambit business now[2].

## III.   JURISDICTION

15.     This Court has jurisdiction over this action under 28 U.S.C. §1332 because the parties are citizens of different states, and the amount in controversy exceeds $75,000.

16.     Venue is proper in this district under 28 U.S.C. § 1391.

17.     The Court has personal jurisdiction over Ambit in that, among other things, Ambit transacts business within New York and contracts to provide services in New York.

---

and Ambit Energy, L.P., Ambit GenPar, Inc., the sole partner of Ambit Energy, L.P., became the sole member of Ambit Texas, LLC. (Exhibit 1.)

[2] April 17, 2012 interview with Thompson available at: http://www.businessforhome.org/2012/04/steve-thompson-ambit-energy-top-earner-interview/.

18.    The Court has personal jurisdiction over Chambless in that, among other things, Chambless, upon information and belief, has committed tortious acts within and/or without New York causing injury to the Plaintiffs; should have reasonably expected the tortious acts to have consequences in New York; and has been deriving substantial revenue from services rendered in New York.

19.    The Court has personal jurisdiction over Thompson in that, among other things, Thompson, upon information and belief, has committed tortious acts within and/or without New York causing injury to the Plaintiffs; should have reasonably expected the tortious acts to have consequences in New York; and has been deriving substantial revenue from services rendered in New York.

## IV. BACKGROUND

20.    Multi-Level Marketing ("MLM"), also known as Network Marketing, is a system, in which distributors promote and sell goods or services directly to potential customers and other potential distributors.  This is contrasted with conventional sales through stores or online, driven mostly by advertisement.

21.    Kasparov has over 22 years of experience in the MLM industry and is well known and respected in the MLM circles.

22.    Upon information and belief, Ambit is an energy reseller. Following the de-regulation of the energy industry in 2000, Ambit started reselling energy in a number of states, including New York and Illinois. Ambit utilizes the existing energy carriers' delivery and billing systems, and makes its profit on the difference between the wholesale and retail energy prices.

4

23.    In the MLM, conventional advertisement is substituted by distributors who look for other prospective distributors and end-clients. In Ambit's nomenclature, the distributors are called consultants.

24.    Further, key to the instant allegations, hierarchy of a consultant is referred to a collection of other consultants (or the combination of other consultants and end-clients) signed up for Ambit's service by the consultant.  An end-client, usually referred to by Ambit as a customer, is a person switching from his or her current energy supplier to Ambit ("Customer").

25.    The seniority titles among the Ambit consultants, in ascending order, is as follows: Marketing Consultant "MC"), Regional Consultant ("RC"), Senior Consultant ("SC"), Executive Consultant ("EC"), and National Consultant ("NC").

26.    An MLM business plan refers to a scheme of bonuses and/or other financial incentives designed to motivate consultants to keep promoting a product – in Ambit's case, energy.

27.    A set of customers and consultants signed up by an Ambit consultant is referred to as downline.  A consultant's downline may be thought of as an upside down tree, which branches can be configured in a variety of ways, and where downstream consultants and customers may be placed on different levels.

28.    It is absolutely crucial for an Ambit consultant to understand the business plan before signing up other consultants or customers.  Typically, there would be a very substantial difference in rewards a consultant may receive between

5

an optimally configured downline compared to a downline configured in a suboptimal manner.

29.     Upon information and belief, motivated by Kasparov's reputation, strong network, and popularity, in the Spring of 2007, on behalf of Ambit, with Chambless's approval, Thompson approached Kasparov with an offer to become the first consultant in New York, as Ambit would be launching its New York operations.

30.     Upon information and belief, Ambit needed somebody well known in the MLM community and well connected in New York to "jump start" its business in a new state, and Kasparov, in Ambit's opinion, ideally fitted the role.

31.     It is a basic core practice in any MLM business, and in Ambit in particular, for consultants to have authority to sign up other consultants, thus executing valid agreements with the consultants on behalf of the MLM business, binding the parties to such agreements.

32.     Without such authority of consultants, any MLM business, including Ambit, simply would not be able to grow.

33.     In any case, by not cancelling membership of a particular consultant within reasonable time, an MLM business ratifies and confirms the authority of a consultant signing up the new consultant and entering with the new consultant into a binding agreement on behalf of the MLM business, Ambit in this case.

## V.   FACTS

A.     <u>Downline Configuration</u>

6

34.     Kasparov refused all Ambit's offers conveyed to him by Thompson on behalf of Ambit prior to the May 2007 meeting in New York.

35.     In May 2007, during the pre-launch period, Kasparov attended a dinner in New York City.   At the dinner, Thompson introduced Kasparov to Chambless.

36.     At the dinner, Chambless was personally persuading Kasparov to join Ambit, but Kasparov had refused again.

37.     In his turn, Kasparov complained to Chambless that he was interested in learning Ambit's business plan, and Thompson would not take time to explain the business plan to Kasparov.

38.     Chambless responded that Kasparov had no reasons to worry about that, as Thompson would take care of optimizing Kasparov's downline, and he himself, Chambless, would also take care of that issue if needed.

39.     Kasparov, still hesitating, was about to leave the dinner, when he saw there coming a reputable MLM professional, Carlos Marin ("Marin").

40.     Marin shared with Kasparov his vision that the energy de-regulation was a good niche for MLM type of businesses and that Ambit could potentially be a good opportunity for Kasparov.

41.     Marin generally completed convincing Kasparov to start working with Ambit as a consultant.

42.     Marin, unlike Thompson, is, and then already was, known in the MLM circles and has a proven record of succeeding in building MLM networks.

7

43.   After the conversation with Marin, Kasparov principally agreed to become an Ambit consultant and help Ambit launch its operations in New York. Kasparov immediately requested a copy of the marketing plan from Thompson and Chambless.

44.   Generally, any consultant is interested in signing other consultants, especially strong ones, thus growing his or her own downline by appending new consultants' downlines.

45.   While Marin, without doubt, was interested in getting Kasparov, Thompson actually was ready to go out of his way to recruit Kasparov to become an Ambit consultant in Thompson's downline.

46.   Kasparov wanted to sign up as an Ambit consultant under Marin because he knew Marin's reputation was strong, and in MLM industry, strong professionals do care about and work on their downline, thus, helping those who sign under them.

47.   When Kasparov told Thompson about his intention to sign up under Marin, Thompson literally begged Kasparov to sign under him.

48.   With the number of consultants Kasparov was about to bring by the grand opening presentation, Thompson promised to make sure he would sign Kasparov directly under him; optimize Kasparov's downline for Kasparov; and arrange the signed consultants in such a way that Kasparov would immediately, upon formal sign up, receive a title of SC.  Thompson made all of these promises to

Kasparov in the presence of Chambless, who also suggested to Kasparov that Kaparov would be better off signing up under Thompson.

49.     In reliance on the above promises, Kasparov made a difficult decision to sign up under Thompson.

50.     At the time Kasparov was signed up in Thompson's downline, it was the mutual understanding of the parties that Kasparov would bring in new consultants to Ambit and Ambit would compensate Kasparov in accordance with the then existing Ambit's compensation plan referred to in the Ambit's standard consultant agreement. (The current Ambit's Standard Consultant Agreement – Exhibit 2; the current Ambit's Policies and Procedures – Exhibit 3; Ambit's Standard Compensation Plan, contained in Ambit's Standard Business Presentation – Exhibit 4.)

51.     Ambit has an account management electronic system with database and an online access for Ambit consultants.

52.     Upon information and belief, during pre-launch and early launch period in New York, this system was not yet setup to allow consultants configuring their downlines.

53.     At the initiation of a new account, a signing up consultant would have to put in his or her information.

54.     Thompson put Kasparov's information into the system, instead of letting Kasparov doing it himself, and hence the incorrect first name for Kasparov in the Ambit's system: Uri instead of Yuri.

9

55.     Being aware of the importance of understanding the marketing plan, Kasparov conditioned his commitment to sign up under Thompson on, among other things, Thompson's promise to timely and thoroughly explain all the details of the Ambit marketing plan.

56.     Nevertheless, Thompson artfully avoided providing Kasparov with the marketing plan, coming up with different excuses and assurances that everything was being taken care of.

57.     Thompson on numerous occasions assured and re-assured Kasparov that Thompson himself would make sure that Kasparov's consultants would be optimally arranged in Kasparov's downline, so that Kasparov could derive the maximum benefits under the Ambit marketing plan existing at the time.

58.     The above arrangement seemed reasonable to Kasparov, since the online access to the New York downline configuration system was not available to Kasparov at that time.

59.     Kasparov was, nevertheless, concerned and worried about his downline configuration, and told so to Thompson numerous times.

60.     However, all Kasparov was technologically able to do at that time, was adding new names to his downline.  Kasparov was not able to see how his downline was actually configured.

61.     Later, Kasparov wanted to instruct Thompson on how to configure his downline, but Thompson responded that it was unnecessary for two reasons: first, because Thompsons himself did everything possible for Kasparov's benefit, and

second, because Kasparov would be able to change that later, when he would receive the technological ability to view and modify his downline online.

62.     Kasparov again fully relied on Thompson's promise to ensure the best possible, and thus the most profitable, configuration of Kasparov's downline.

63.     Upon information and belief, Thompson did not have access to the system and could not arrange Kasparov's downline without the help from Chambless, who, upon information and belief, did have master access to the accounts like Kasparov's.

64.     Kasparov was repeatedly asking Thompson for access to the system that would permit him to at least view his downline, but Thompson refused.

65.     Before the launch, or the grand opening in other words, which took place on June 4, 2007, Kasparov signed up about eighty five consultants, of which around sixty actually paid the required fees and became active consultants.

66.     Starting June 2007, Kasparov began receiving checks form Ambit.

67.     According to Kasparov's estimation, the checks were for significantly smaller amounts than what he was entitled to.

68.     When the Ambit's account management system for New York started finally functioning to the full extent, and Kasparov finally received access to view his downline configuration, he realized that his key consultants were misplaced:  In fact, his downline was arranged to provide the maximum benefit to Thompson, not to Kasparov.

69.     Kasparov made numerous additional requests to be allowed to re-configure his downline to optimize it for his own benefit, but all his requests were either ignored or rejected without a reasonable explanation. In fact, not only Thompson refused to assist Kasparov in his request, but Thompson also asserted that Chambless also would not let Kasparov change the configuration of his downline.

70.     When Kasparov personally complained to Chambless about what happened and that Thompson had not assisted him in his request to reconfigure his downline, Chambless did not seem to be surprised at all.

71.     Moreover, when Kasparov told Chambless that with the current configuration of his downline he worked as a slave for free for Thompson and requested from Chambless to let him re-arrange his downline, Chambless agreed with Kasparov that he worked for free for half a year for Thompson and suggested that Kasparov would start working then, after receiving the title of EC, for himself.

72.     Kasparov, outraged by Chambless's answer, complained to and sought advice of Brian McClure, Ambit's Founding National Consultant and Ambit's number one income earner, at Ambit's Power Trip Spring 2008 seminar. Brian McClure told Kasparov that he had heard similar complains about Thompson and that for Texans it was not a secret that Thompson was a selfish, self-centered man, but he, Brian McClure, did not know how to help Kasparov in his situation.

12

73.     Upon information and belief, Chambless was aware that Thompson was arranging Kasparov's downline and that Thompson was optimizing it for his own, rather than Kasparov's, benefit.

74.     Upon information and belief, Thompson shared with Chambless the benefits he derived from configuring Kasparov's downline for his own benefit.

75.     To put amount of damages in perspective, at the time Kasparov finally received the title of EC, he had thirty six SCs in his downline instead of merely five required for becoming an EC.  Now, Kasparov has twenty nine ECs in his downline and still was not promoted to the NC level, while according to Ambit's marketing plan, it is only necessary to have five executive consultants to be promoted to NC.

76.     Upon information and belief, the above wrongful acts of Thompson and Chambless resulted in their unjust enrichment and in damages Kasparov suffered.

B.     Termination of Aleph's position with Ambit

77.     According to Ambit's policy, consultants may be companies as well as individuals.

78.     In the Spring of 2009, Aleph was signed up as a consultant in Kasparov's downline.

79.     The sign up occurred at a presentation where the consultant signing up Aleph described only a portion of the terms of the agreement between Ambit and its consultants, to which Aleph agreed; took Aleph's information; and personally initiated opening of Aleph's account with Ambit, thus precluding Aleph from reading the on-line agreement in its entirety by Aleph's representative.

13

80.    Upon information and belief, it was Ambit's usual and common practice that a consultant signing up a new consultant would open a new account by him- or herself, explaining the basic operational terms to the new consultant orally and not allowing the new consultant to see and read the entire agreement.

81.    Aleph moved up in ranks to become SC in September, 2009.

82.    From September to November, 2009, Aleph became EC.

83.    Aleph's income in that period grew from about $2,000 a month to about $15,000 a month in bonuses and from almost nothing to about $600 in residual payments that usually experience a significant lag.

84.    Around December 2009, Ambit stopped paying Aleph.

85.    The reason for stopping payments was, according to Ambit, that another Ambit consultant, Shmuel Rimler ("Rimler"), was caught slamming.

86.    In this context, slamming means signing up a consultant or a customer without a proper procedure or without such signee's knowledge altogether.

87.    Rimler was in Aleph's downline, on a level that resulted in no profit to Aleph from Rimler's activity, legal or illegal.

88.    Nevertheless, at that time, Rimler alleged that Aleph and its immediate sponsor, under whom Aleph had signed up, and for whom Rimler also was outside the zone of potential profitability, were behind the slamming.

89.    Aleph, as well as its sponsor, rejected the allegations and provided reasonable evidence and arguments that they did not stand behind the slamming.

90.     In fact, Rimler needed money to invest into his slamming scheme as he himself had to pay the initiation fees for every new signee.

91.     Before he was caught slamming, Rimler approached Aleph and its immediate sponsor asking for a loan.

92.     Aleph and its sponsor refused to give Rimler the loan.

93.     Thus, when Rimler was caught, he decided to "get back" at Aleph and its sponsor, for refusing to give him the loan by alleging they were behind the scheme.

94.     Rimler later admitted that the revenge for refusing to give him the loan was his true intention in accusing Aleph and its sponsor, and that his allegations were false.

95.     Aleph explained to Ambit in detail what had happened, and that Aleph was not and reasonably could not have been behind Rimler's slamming scheme.

96.     Actually, Aleph had a large well developed network of clients of Aleph management's other retail business.  For Aleph, it was a good source of potential consultants and customers.

97.     Engaging in slamming while having a legitimate access to such network would be more than unreasonable.

98.     Ambit did not produce a single additional piece of evidence or an argument to prove Aleph's wrongdoing.

99.     The only exception was Ambit's allegation that Aleph could potentially use Rimler as an SC to become an EC.

15

100.   Aleph addressed that allegation and demonstrated that Rimler's title was unnecessary for Aleph to become an EC.

101.   Nevertheless, without further discussion or investigation, Ambit terminated Aleph's account with Ambit in the Spring of 2010.

102.   Ambit transferred all Aleph's consultants and Customers under the 'house' account, thus unjustly enriching and, upon information and belief, demonstrating the real reason behind Aleph's termination.

103.   As the result of the above Ambit's wrongful actions, Kasparov suffered damages from loosing profits from Aleph's downline.

104.   Aleph was signed in Kasparov's fourth level.

105.   As a result of the above wrongful actions of Ambit, Aleph suffered damages.

106.   Ambit purposefully precluded Aleph from growing into one of the most profitable accounts with Ambit.

C.   Seniority

107.   According to Thompson's promise (which also was not kept), Kasparov was supposed to be signed up at the fourth level from the top of the pyramid, having Brain McClure and Phillip Eckert, both initiated as NCs, and Thompson, initiated as EC, above him (later Thompson became NC with just one EC in his downline for, upon information and belief, "his" success in New York).

108.   Although Kasparov was much more experienced and well known in the MLM circles than Thompson, he was not offered a commensurate seniority title at the time of his initiation, which would be a common practice in the MLM business.

109.   The only reason why Kasparov did not insist on getting a senior title was that having just a general idea about Ambit's marketing plan and also relying on Thompson's promise, he reasonably expected that with the number and quality of consultants he was about to sign up, he would obtain the commensurate seniority (EC) in a matter of weeks, and the SC title on the first day at the grand opening.

110.   The significance of titles within Ambit is twofold: first, it is a very important and helpful tool in attracting and signing up new consultants, and, second, a more senior title provides more benefits according to Ambit's marketing plan.

111.   Not having been assigned a proper title at his initiation and not having received the appropriate title as soon as he would with the optimized downline, Kasparov suffered damages, both monetary and to his reputation, which ultimately resulted in even greater monetary damages in a long run.

D.   Residual Payments

112.   Upon information and belief, Ambit underpaid Kasparov and Aleph in residual payments.

113.   According to the Ambit marketing plan, residual payments are based, in general, on the number of customers signed up and the amount of energy consumed by the customers.

114.   Upon information and belief, Kasparov and Aleph systematically received residual payments that were below payments they were due according to the Ambit's compensation plan, and they did not receive the residual payments for all the customers they signed up.

115.   Moreover, Kasparov's average on his fifth and sixth levels was only below 90%.

116.   Even assuming that some Customers did not pay their bills in a given month, that deficiency must have been compensated for in the following months and be reflected in the amount of the residual payments received then.  (After all, everybody eventually pays the electric and gas bills or gets disconnected.)

117.   Kasparov and Aleph were damaged in the amount Ambit owed and still owes them in residual payments.

E.   Avoiding Paying Bonuses

118.   According to the Ambit marketing plan, Ambit would pay certain bonuses to the consultants who would sign up a certain amount of consultants and/or customers within a certain period, in accordance with the Ambit compensation plan.

119.   Upon information and belief, Ambit avoided paying certain bonuses to its consultants, including Kasparov and Aleph, by cancelling some consultants or customers.

120.   For instance, a consultant in Aleph's downline signed his own business as a customer only to learn the next day that it was under Ambit's 'house' account, which, according to Ambit, was done because of that customer's request.

121.   Kasparov, Aleph and other consultants detected a trend that on too many occasions to be merely coincidental, the last consultant/customer signed up to satisfy eligibility for a bonus, would, without any reason, be cancelled the last moment, thus precluding the signing consultant from receiving the bonus.

122.   Not only did it cause the consultants, including Kasparov and Aleph, to suffer monetary damages, but it also caused frustration among newly signed consultants who counted on these bonuses to compensate for the sign up and other expenses.

123.   Dissatisfied consultants lost trust in Ambit and were discontinuing their work, which caused further aggravation and significant damage to the downlines of the most productive higher-level consultants, including Kasparov and Aleph.

124.   Upon information and belief, the detected trend was aimed specifically at reducing bonuses to the highly productive consultants.  These consultants were working and assisting their respective downline consultants.

125.   Upon information and belief, such performance was undesirable to Ambit, because these consultants were deriving close to the maximum benefits, paid by Ambit, in accordance with the Ambit compensation plan.

126.    As a result of the above wrongful acts, Kasparov and Aleph suffered significant damages both, monetary and to their reputation.

F.    Unauthorized Transfers

127.    Upon information and belief, the number of cancellations in Kasparov's and Aleph's respective downlines was unreasonably high.

128.    Upon information and belief, Ambit transferred some of Kasparov's and Aleph's downline, without authorization, under other accounts, including the 'house' account.

129.    For instance, Kasparov's downline suffered more than 100,000 cancellations, which Kasparov believes is not only unreasonable, but impossible.

130.    As the result of the above wrongful acts of Ambit, Kasparov and Aleph suffered damages.

G.    Kasparov's Suspension

131.    Kasparov took his engagement with Ambit very seriously.  He went as far as relocating to New York in order to advance and promote Ambit's business.

132.    Moreover, he put his personal life on the line: the very next day after getting married on September 16, 2008, instead of the planned honeymoon, Kasparov went to an Ambit convention together with his wife.

133.    Kasparov sacrificed his personal life in many ways to give all he had to Ambit.

134.    In fact, very soon after Kasparov signed up as a consultant with Ambit, the number of consultants in his downline by far exceeded the number Thompson

20

had, independently of Kasparov's downline.  (Technically, since Kasparov was signed in Thompson's downline, Kasparov's downline became also Thompson's downline.)

135.   For example, just at the launch event, Kasparov signed up about eighty five persons of whom about sixty paid their initiation fees and became active consultants.

136.   Ambit was unknown in New York.  Ambit's undisputable success in New York had to be exclusively credited to Kasparov's involvement, participation, connections, and dedicated hard full time work.

137.   At the Ambit convention in 2008, Brian McClure noted that Kasparov already had about 7,000 consultants and about 27,000 customers.  Kasparov's achievement was used as an example for the whole Ambit organization.

138.   Thompson was admitting to Kasparov that his earning sky rocketed only because of Kasparov's work.

139.   On information and belief, Thompson, was very soon receiving about $50,000 per week in bonuses and about $100,000 a month in residual payments, for the total of approximately $300,000 a month.

140.   Notwithstanding all of the above, in or about March 2011, Kasparov's account with Ambit was suspended.

141.   When a consultant's account is suspended, he or she would not receive any money from Ambit for the duration of the suspension.

142.    Ambit alleged that the reason for the suspension was that Kasparov's wife was involved with an Ambit's competitor.

143.    Kasparov requested that Ambit would produce proof of its allegations; Ambit failed to do so.

144.    About four months later, Ambit reinstated Kasparov's account.

145.    Ambit never compensated Kasparov for the damages he suffered as the result of the suspension, nor did anyone apologize to Kasparov on Ambit's behalf.

146.    This incident, exacerbated of many other humiliations Kasparov suffered from Ambit in general, and Thompson and Chambless in particular, eventually caused Kasparov and his wife such trauma and affected their relationship in such a way, that, sadly, Kasparov's wife has filed for divorce.

H.    <u>Failure in Illinois</u>

147.    In the wave of Ambit's success in New York, mostly attributed to Kasparov's efforts and his hard and diligent work, Ambit asked Kasparov to prepare a similar launch of its operations in Illinois.

148.    Kasparov would have to gather and sign up as many consultants as he possibly could by the grand opening.

149.    Ambit assured Kasparov that all conditions of the consultants' work and basic operations would be identical to the conditions and operations in New York, as well as that the grand opening, or launch in other words, would occur within thirty days from the pre-launch event.

150.   In fact, in the beginning of November 2007, at the event promoting the anticipated Illinois launch at Sheraton hotel in Flushing, New York, Thompson publicly promised that the pre-launch period would start on December 1, 2007, and last for thirty days and that the Illinois promotional rates would be identical to the New York ones.

151.   Kasparov did a tremendous job, put maximum efforts, put his reputation on the line, personally travelled not less than ten times to Chicago and utilized all his connections bringing on board just by himself a record-breaking number of consultants, about an 800 person team.

152.   All of the consultants relied on Kasparov's word, which he in turn gave relying on Ambit's promises that operations in Illinois would adhere to the New York rules and that the grand opening would take place within thirty days of the pre-launch.

153.   These consultants, each paid $425 initiation fee and were paying monthly internet fee of $25 (never returned to them by Ambit).

154.   Ambit launched its operations in Illinois only six months after the pre-launch, on May 27, 2008.

155.   Upon information and belief, Ambit's management knew or should have known soon after requesting Kasparov's active participation in the pre-launch work that the Illinois launch would not happen in the following few months, but intentionally and wrongfully failed to share that information with Kasparov.

23

156.   Thus, Kasparov was knowingly misled by Ambit regarding the real timing of the Ambit's launch of operations in Illinois.

157.   Based on that false information, on which Kasparov fully relied, he unknowingly and unintentionally misled about 800 of his colleagues and collaborators.

158.   Virtually all of those consultants sooner or later decided against working with Kasparov and Ambit.

159.   Kasparov lost this unique opportunity to earn in Illinois more than ten times of what he would earn in New York with a properly configured downline. This is based on the number of the consultants that Kasparov signed up before the launch in Illinois, as compared to the respective number in New York.

160.   Moreover, not only did Kasparov lose Illinois permanently for all his potential future endeavors, as nobody would want to hear his name in Illinois since the failure with Ambit, but also his reputation was damaged far beyond the borders of Illinois.

## VI.   DAMAGES

I.   <u>Kasparov</u>

161.   Kasparov has more than 130,000 customers and more than 25,000 consultants in his downline.  In addition, he has about 200 non-for-profit organizations as additional customers.

162.   At presentations, through its representatives, as well as in the advertisement brochures, Ambit claimed that according to its business plan, about

11,000 customers in one downline should yield about $13,000 of residual payments per month.

163.    Out of all Kasparov's customers, about 18,000 are within the first six levels, where the residuals are paid.

164.    Considering the fact that Kasparov received the title of EC only when he reached thirty six SC consultants in his downline, while five would be sufficient with the proper configuration, it could be said that Kasparov's downline was detuned by the factor of approximately seven (36 divide by 5).

165.    Thus, Kasparov's 18,000 Customers within his first six levels should be multiplied by the factor of 7 to reflect what his downline would look like if properly configured: that would be 126,000 customers.

166.    Assuming a linear growth, we can assume 84,000 on average over the five years Kasparov spent with Ambit.

167.    With that number of customers, according to Ambit's plan, Kasparov should have been receiving as follows: 84,000 customers divided by 11,000 customers assumed in Ambit's marketing plan and multiplied by $13,000 promised by Ambit's marketing plan, monthly, which is $99,272 per month.

168.    Over the course of about 5 years, that would be $99,272 multiplied by 12 months and multiplied by 5 years, which is approximately $6,000,000.

169.    Kasparov lost in bonuses in accordance with Ambit's plan that he would otherwise get with an optimally arranged downline, and the amount lost should be determined at trial but in no event it should be less than $4,000,000.

25

170.   Kasparov was damaged by Ambit's frivolous and capricious termination of Aleph's account and hijacking of its entire downline.  These damages are to be determined at trial but should be not less than $500,000.

171.   All of the above damages keep accumulating and growing (Ambit is one of the fastest growing businesses in the United States), and therefore, the future projected damages must be determined at trial, but should not be less than $25,000,000.

172.   As a result of the failure in Illinois, based on the fact Kasparov had signed up about 800 consultants pre-launch, Kasparov suffered enormous losses to be determined at trial but not less than $25,000,000.

173.   Kasparov suffered further damages as the result of other wrongdoings by Ambit set forth herein, such as avoiding paying certain bonuses to Kasparov's downline; unauthorized Customer transfers; and suspending Kasparov's account with Ambit for about four months without reason, justification or even excuse. Each of the above constitutes a breach by Ambit of its standard agreement with its consultants, which agreement was available at all relevant times online.  These damages are to be determined at trial but should not be less than $3,000,000.

174.   Interest on the damages Kasparov sustained keeps accruing and accumulating, and the defendants should be held accountable for the interest. The defendants, as well, shall reimburse Kasparov for the costs and expenses related to this action, including the attorney's fees.

175.    In addition, around the time of commencement of this action, Ambit again suspended Kasparov's account without any reason or even a notice, in breach of Ambit's standard agreement with its consultants, thus significantly adding to the amount of damages Kasparov suffered as the result of Ambit's breaches of its standard agreement with its consultants.  Kasparov, meanwhile, never breached and preformed in accordance with the terms of the Ambit's standard agreement.

J.    <u>Aleph</u>

176.    Aleph was damaged by frivolous and capricious termination of its account and hijacking of its entire downline.  These damages are to be determined at trial but should be not less than $8,000,000.

177.    Aleph suffered further damages as the result of other wrongdoings by Ambit, such as avoiding paying certain bonuses to Aleph's downline and unauthorized Customer transfers.  These damages are to be determined at trial but should not be less than $300,000 dollars.

178.    Interest on the damages Aleph sustained keeps accruing and accumulating, and the defendants should be held accountable for the interest.

179.    Ambit, as well, shall reimburse Aleph for the costs and expenses related to this action, including the attorney's fees.

## VII. COUNT ONE (KASPAROV)
### (Fraud and Deceit)

180.    Kasparov repeats and realleges the allegations made in paragraphs 1 through 179 above.

181.    Thompson misrepresented to Kasparov that Thompson was intending and would optimize Kasparov's downline in Kasparov's best interest and for Kasparov's benefit.

182.    Upon information and belief, Thompson intended to arrange Kasparov's downline to Thompson's own benefit at the time he was misrepresenting that fact to Kasparov, and therefore knew that his representation to Kasparov was false.

183.    Upon information and belief, Thompson made the above misrepresentation to Kasparov in order to induce Kasparov to agree to sign up without learning first the Ambit's marketing plan and agreeing that Thompson would be arranging Kasparov's downline for Kasparov.

184.    Kasparov's reliance on Thompson's misrepresentation was not unjustifiable, as it is rather common in the MLM industry to provide continuous help and support to those one signs up.

185.    Upon information and belief, Chambless was aware of Thompson's plans and was helping him.

186.    Thompson is positioned at the third level from the top of Ambit's marketing pyramid while Chambless is a co-founder and arguably the second man in the company, after Jere W. Thompson, Jr., Ambit's CEO.

187.    Further, upon information and belief, Thompson acts relevant here were directly authorized by Chambless.

188.    Therefore, the concerted acts of Chambless and Thompson shall bound Ambit.

189.    Thus, the defendants are jointly and severally liable for all harm set forth herein caused to Kasparov.

190.    As the result of the above wrongful acts of the defendants Kasparov suffered damages.

191.    The amount of damages Kasparov suffered is to be proven at trial, but in no event is less than $25,000,000.

192.    The defendants acted intentionally, willfully and/or with reckless disregard when making false representations and in enticing Kasparov to rely thereupon to his detriment and damage.  Kasparov is entitled to an award of punitive damages in an amount to be determined at trial but believed to be in excess of $50,000,000.

### VIII. COUNT TWO (KASPAROV)
### (Conspiracy)

193.    Kasparov repeats and realleges the allegations made in paragraphs 1 through 192 above.

194.    The defendants defrauded Kasparov as is set forth above in the Count One.

195.    Upon information and belief, there was a corrupt agreement to defraud Kasparov between Thompson and Chambless.

196.   Upon information and belief, Chambless granted Thompson access to Ambit's system in order to arrange Kasparov's downline in accordance with the defendants' plans, or, alternatively, did the arrangement himself.

197.   Defendants Thompson and Chambless, upon information and belief, acted intentionally and knowingly in the furtherance of their purpose.

198.   As the result of the above wrongful acts of the defendants, Kasparov suffered damages.

199.   The amount of damages Kasparov suffered is to be proven at trial, but in no event is less than $25,000,000.

## IX. Count Three (Kasparov)
### (Breaching Fiduciary Duty)

200.   Kasparov repeats and realleges the allegations made in paragraphs 1 through 199 above.

201.   By undertaking upon himself to arrange Kasparov's downline for Kasparov, as Kasparov's consideration to join Thompson's downline, Thompson became Kasparov's fiduciary, thus owing him a duty of loyalty in configuring his downline.

202.   Notwithstanding a clear personal conflict of interest, Thompson configured Kasparov's downline in a self dealing manner.

203.   Thus, Thompson acted contrary to Kasparov's interests, injuring him.

204.   Kasparov sustained damages that were directly caused by

Thompson's misconduct.

205.   The amount of damages Kasparov suffered is to be proven at trial, but in no event is less than $25,000,000.

## X. COUNT FOUR (KASPAROV)
### (Unjust Enrichment)

206.   Kasparov repeats and realleges the allegations made in paragraphs 1 through 205 above.

207.   Even if the existence of a valid contract between Ambit and Kasparov is not established, the defendants herein failed to make restitution for the benefits received by them for the work performed by Kasparov (which, among other things, consisted of making presentations; signing up consultants and customers; helping the consultants in his downline; promoting Ambit business; and otherwise working to help growing Ambit's profits) where he thought he was working for himself, while due to the defendant's fraud he in fact worked for them.

208.   The defendants are legally obligated to account for the benefits received.

209.   The defendants equitably obligated to account for the benefits received.

210.   None of the defendants provided any restitution to Kasparov.

211.   Kasparov sustained damages as the result of the defendant's unjust enrichment.

212.   The amount of damages Kasparov suffered is to be proven at trial, but in no event is less than $25,000,000.

## XI. COUNT FIVE (KASPAROV)
### (Breach of Contract Causing Damage)

213.   Kasparov repeats and realleges the allegations made in paragraphs 1 through 212 above.

214.   In May 2007, Kasparov on the one hand, and Thompson and Chambless on behalf of Ambit on the other hand, entered into an oral agreement, whereas Kasparov agreed to become Ambit's consultant, MC at that time, and Ambit by Thompson and Chambless agreed to compensate Kasparov in accordance with the Ambit standard compensation plan.  The rules of the compensation were made available later on the Internet and were similar and uniform for all consultants in New York.

215.   Kasparov performed in accordance with his contractual obligations and never breached the contract.

216.   Ambit failed to perform in that it, among other things, underpaid Kasparov in residual payments it was obligated to pay in accordance with the ambit standard compensation plan – a breach under the contract; unjustifiably cancelled membership of consultants and/or customers – a breach under the contract – that caused Kasparov and/or members of his downline to lose promotional bonuses and generally caused frustration among the more enthusiastic consultants; cancelled or transferred without authorization the Kasparov's downline

32

accounts – a breach under the contract; suspended Kasparov's account without reason or justification – a breach under the contract; failed to provide Kasparov with an ability to timely arrange his own downline or make necessary corrections later – a breach under the contract.

217.   As the result of the above breaches and wrongful acts of the defendants, Kasparov suffered damages.

218.   The amount of damages Kasparov suffered is to be proven at trial, but in no event is less than $28,000,000.

## XII. COUNT SIX (KASPAROV)
### (Promise Causing Detrimental Reliance)

219.   Kasparov repeats and realleges the allegations made in paragraphs 1 through 218 above.

220.   Ambit, by Thompson and Chambless, in or about November 2007, made a clear and unambiguous promise to Kasparov to launch its operations in the State of Illinois within thirty days of the pre-launch and that the rules of such operation would be identical to the rules in New York.

221.   It was understood and contemplated that Kasparov would be actively involved in preparing such launch of Ambit's operations in Illinois, and therefore Kasparov's reasonable and foreseeable reliance on Ambit's promise was natural and predictable by Ambit.

222.   In reliance on the Ambit's promise, Kasparov sustained damages.

33

223.   The amount of damages Kasparov suffered is to be proven at trial but believed to be in excess of $25,000,000.

## XIII. COUNT SEVEN (ALEPH)
### (Breach of Contract Causing Damage)

224.   Aleph repeats and realleges the allegations made in paragraphs 1 through 223 above.

225.   In the Spring of 2009, Aleph on the one hand, and Ambit, by its consultant who signed up Aleph, on the other hand, entered into an oral agreement, whereas Aleph agreed to become Ambit's consultant, MC at that time, and Ambit by its signing consultant agreed to compensate Aleph in accordance with the Ambit standard compensation plan.  The rules of the compensation, according to the contract, were and are uniform for all consultants in New York.

226.   Aleph, like Kasparov, performed in accordance with the contract.

227.   Ambit failed to perform in that it, among other things, underpaid Aleph in residual payments in accordance with the Ambit's standard compensation plan – a breach under the contract; unjustifiably cancelled membership of consultants and/or Customers – a breach under the contract – that caused Aleph or members of its downline to lose promotional bonuses and generally caused frustration among the more enthusiastic consultants; cancelled or transferred without authorization Aleph's downline accounts – a breach under the contract; and wrongfully terminated Aleph's account with Ambit – a breach under

34

the contract.

228.   As the result of the above wrongful acts of defendant Ambit, Aleph suffered damages.

229.   The amount of damages Aleph suffered is to be proven at trial, but in no event is less than $8,300,000.

### XIV. COUNT EIGHT (ALEPH)
### (Unjust Enrichment)

230.   Aleph repeats and realleges the allegations made in paragraphs 1 through 229 above.

230.   Even if the existence of a contract between Ambit and Aleph is not established, defendant Ambit failed to make restitution for the benefits received by it for the work performed by Aleph (which, among other things, consisted of making presentations; signing up consultants and customers; helping the consultants in his downline; promoting Ambit business; and otherwise working to help growing Ambit's profits) where Aleph was building its downline in order to further develop and derive benefits from it, but due to Ambit's wrongful acts, Ambit, and not Aleph, in fact received benefits from the downline built by Aleph.

231.   Ambit is legally obligated to account for the benefits received.

232.   Ambit is equitably obligated to account for the benefits received.

233.   Ambit provided no restitution to Aleph.

234.   Aleph sustained damages as the result of Ambit's unjust enrichment.

235.    The amount of damages Aleph suffered by not receiving the benefits unjustly being received by Ambit is to be proven at trial, but in no event is less than $3,000,000.

**WHEREFORE**,    KASPAROV respectfully requests that the Court grant him judgment against the defendants as follows:

A.    On the First Count, Kasparov demands $25,000,000 in compensatory damages and $50,000,000 in punitive damages;

B.    On the Second Count, Kasparov demands $25,000,000 in compensatory damages;

C.    On the Third Count, Kasparov demands $25,000,000 in compensatory damages;

D.    On the Fourth Count, Kasparov demands $25,000,000 in compensatory damages;

E.    On the Fifth Count, Kasparov demands $28,000,000 in compensatory damages;

F.    On the Sixth Count, Kasparov demands $25,000,000 in compensatory damages;

G.    Grant Kasparov the total demanded amount of $103,000,000, including punitive damages, with interests, costs and expenses, including attorney's fees, and such other and further relief as the Court may deem just, proper and equitable; and

ALEPH respectfully requests that the Court grant it judgment against Ambit as follows:

      H.    On the Seventh Count, Aleph demands $8,300,000 in compensatory damages;

      I.    On the Eighth Count, Aleph demands $3,000,000 in compensatory damages;

      J.    Grant Aleph the total demanded amount of $8,300,000 with interest, costs and expenses, including attorney's fees, and such other and further relief as the Court may deem just, proper and equitable.

Dated: Brooklyn, New York
       November 16, 2012

Respectfully submitted,

HYMOWITZ LAW GROUP, PLLC
*Attorneys for Yuri Kasparov & Aleph Towers, LLC.*

By:     _____
       Daniel Hymowitz (DH-0936)
       2080 Coney Island Avenue
       Brooklyn, New York 11223
       (718) 807-9900
       daniel@hymowitzlawgroup.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STATE OF NEW YORK  }
                     } Ss:
COUNTY OF KINGS   }

      I, URI KASPAROV, am the Plaintiff in the within action.  I have read the

foregoing Amended Complaint and know the contents thereof.  The contents are true

to my own knowledge except as to matters therein to be alleged upon information and belief,

and as to those matters I believe them to be true.

Subscribed and Sworn to before me on:

MELISSA RAMIREZ
NOTARY PUBLIC-STATE OF NEW YORK
No. 01RA6241171
Qualified in Kings County
My Commission Expires May 16, 2015

11 16 2012

NOTARY PUBLIC

PLAINTIFF'S SIGNATURE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STATE OF NEW YORK   }
                    } Ss:
COUNTY OF KINGS     }

I, Philip Gorbulsky, am an authorized representative of Plaintiff Aleph Towers LLC in the within action. I have read the foregoing complaint and know the contents thereof. The contents are true to my own knowledge except as to matters therein to be alleged upon information and belief, and as to those matters I believe them to be true.

Subscribed and Sworn to before me on:

_____                    _____

                                             PLAINTIFF'S SIGNATURE
                                             Philip Gorbulsky for Aleph Towers, LLC

_____
NOTARY PUBLIC

MELISSA RAMIREZ
NOTARY PUBLIC-STATE OF NEW YORK
No. 01RA6241171
Qualified in Kings County
My Commission Expires May 16, 2015