| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | FOR ONLINE PUBLICATION ONLY |

ALEPH TOWERS, LLC, YURI (URI) KASPAROV,

                      Plaintiffs,

    -versus-

AMBIT TEXAS, LLC, CHRIS CHAMBLESS, STEVEN THOMPSON,

                      Defendants.

MEMORANDUM & ORDER
12-CV-3488

A P P E A R A N C E S

    HYMOWITZ LAW GROUP, PLLC
        2080 Coney Island Avenue
        Brooklyn, NY 11223
        By: Daniel Hymowitz
        *Attorney for Plaintiffs*

    THOMPSON & KNIGHT, LLP
        1722 Routh Street
        Suite 1500
        Dallas, TX 75201
        Stephen C. Rasch
        Matthew M. Mitzner
        Gabrielle Farina
        *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

        Plaintiffs assert common law claims for fraud, conspiracy, breach of contract, unjust enrichment, promissory estoppel, and breach of fiduciary duty against defendants, Ambit Texas, LLC, Steven Thompson, and Chris Chambless. All defendants move to dismiss for lack of subject matter jurisdiction and, in the alternative, for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (6). The individual defendants also move to dismiss for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). For the reasons that follow, the motion to dismiss is granted in part and denied in part.

BACKGROUND

A.        *Parties*

Defendant Ambit Texas, LLC ("Ambit") is a network marketing organization that sells energy through the use of independent consultants. Am. Compl., Ex. 3, Ambit Policies and Procedures ("Ambit P&P") § 1.2, ECF No. 18-3. Defendant Chris Chambless is a "co-founder and chief marketing officer of Ambit." Am. Compl. ¶ 12. Defendant Steven Thompson "was one of the first consultants building Ambit's business and is one of the top earning consultants in the Ambit business," *id.* ¶ 14. Plaintiffs Yuri Kasparov and Aleph Towers, LLC ("Aleph") are consultants who sold energy on Ambit's behalf. *Id.* ¶¶ 84, 94, 142.

B.        *Factual Allegations*[1]

    1.  *Overview of Ambit Texas, LLC*

Ambit utilizes Multi-Level Marketing ("MLM") to promote and sell energy directly to potential customers and other potential distributors.[2] Ambit's "business plan" is a "scheme of bonuses and/or other financial incentives designed to motivate consultants to keep promoting a product." *Id.* ¶ 26. A "downline" is the set of customers and consultants recruited by a particular consultant. *Id.* ¶ 27. The financial benefits a consultant receives will vary depending on how a downline is configured. An "optimally configured downline" is better than a "downline configured in a suboptimal manner." *Id.* ¶ 28. Ambit maintains each consultant's downline information in "Downline Activity (Genealogy) Reports." Ambit P&P § 4.8.4.

    2.  *Allegations of Defendants' Wrongdoing*

        a.  *Aleph Towers, LLC*

Aleph became a consultant for Ambit in the Spring of 2009. Am. Compl ¶ 79. At the time it signed up, Aleph was "precluded . . . from reading the online agreement in its entirety."

---

[1] In accordance with the standards for assessing a motion to dismiss, the factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiffs' favor. In addition, I consider documents attached to the complaint or incorporated by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002).

[2] A distributor is also referred to as a "consultant." Am. Compl. ¶¶ 20-22.

*Id.* Aleph received bonuses and residual payments from Ambit and was promoted up the Ambit compensation hierarchy. *Id.* ¶¶ 81-82. However, in December 2009, another Ambit consultant accused Aleph of engaging in "slamming," *i.e.*, the "unauthorized conversion of a customer's energy service from the current service provider to a new energy company." Ambit Consultant Application and Agreement ("Ambit Agreement") ¶ 12; Am. Compl. ¶ 84. Ambit stopped paying Aleph based on this accusation. Aleph alleges that these accusations were false, Am. Compl. ¶ 94, and the "real reason behind [this] termination, was Ambit's desire to enrich itself by transferring Aleph's accounts to the 'house account.'" *Id.* ¶ 102.

b. *Yuri Kasparov*

In the Spring of 2007, Defendant Thompson approached Kasparov "on behalf of Ambit" and asked Kasparov to become Ambit's first consultant in New York. *Id.* ¶¶ 21, 29. Thompson recruited Kasparov to sign up as an Ambit consultant under Thompson's downline by "promis[ing] to . . . . optimize Kasparov's downline for Kasparov; and [to] arrange the signed consultants in such a way that Kasparov would immediately, upon formal sign up, receive a title of [Senior Consultant]."). Thompson promised Kasparov that, by signing up under him, Kasparov would be able to "derive maximum benefits under the Ambit marketing plan." *Id.* ¶ 56. Chambless also promised to "take care of" optimizing Kasparov's downline. *Id.* ¶¶ 38, 48. After a "formal sign up," *id.* ¶ 48, Kasparov began working as an Ambit consultant in 2007, *id.* ¶ 41, 43, and moved to New York to promote Ambit's business. *Id.* ¶ 131. Kasparov began to receive checks from Ambit in June 2007. He "reasonably expected that . . . he would obtain the commensurate seniority . . . in a matter of weeks" based on Thompson's promises to optimize his downline. *Id.* ¶ 110.

Ambit maintains a database that consultants can access to configure their downlines. *Id.* ¶ 52. Kasparov was unable to "view and modify his downline configuration" and unable "to see how his downline was actually configured." *Id.* ¶ 60. Thus, he was unaware how

3

his downline was actually configured, *id.* ¶ 60-61. He "relied on Thompson's promise to ensure the . . . most profitable, configuration of Kasparov's downline." *Id.* ¶ 62.

Thompson configured Kasparov's downline for Thompson's own benefit and allegedly shared these benefits with Chambless. *Id.* ¶ 73. Kasparov discovered that "his key consultants were misplaced," and the "downline was arranged to provide maximum benefit to Thompson," *id.* ¶¶ 68, 111. As a result of this failure to keep a promise, Kasparov suffered "enormous losses." *Id.* ¶¶ 164, 169, 172. Ambit paid him amounts "significantly smaller amounts than what he was entitled to" under the contract. *Id.* ¶ 67.

c. *Illinois Launch*

Kasparov also alleges that Ambit asked "Kasparov to prepare a similar launch in Illinois," and "Thompson publicly promised that the pre-launch period would start on December 1, 2007." *Id.* ¶ 150. However, this launch did not happen and Ambit "wrongfully failed to share that information with Kasparov," when Ambit "knew or should have known" that this would occur. *Id.* ¶¶ 149-155. As a result, Kasparov "lost this unique opportunity to earn in Illinois," and misled 800 of his colleagues who signed up based on Kasparov's promise that the grand opening would take place within thirty days. *Id.* ¶¶ 152-159.

d. *Lost income*

Plaintiffs allege that Ambit transferred some accounts in their downline "[to] other accounts," *id.* ¶¶ 127-128. These cancellations resulted in money damages, reputational damage, and damage to the downlines of both Kasparov and Aleph. Plaintiffs allege that they were deprived of the "residual payments" required by the Ambit compensation plan. *Id.* ¶ 114.[3] Ambit's compensation plan required Ambit to "pay certain bonuses to the consultants who would sign up a certain number of consultants." However, Ambit avoided its obligation to pay bonuses to Kasparov and Aleph by cancelling consultants. *Id.* ¶ 119. Plaintiffs "detected a trend that on

---

[3] Residual payments are "based, in general, on the number of customers signed up and the amount of energy consumed by the customers." Am. Compl. ¶ 113.

4

too many occasions to be merely coincidental, the last consultant/customer signed up to satisfy eligibility for a bonus would, without any reason be cancelled at the last moment, thus precluding the signing consultant from receiving a bonus." *Id.* ¶ 121.

C.      *Procedural History*

On November 16, 2012, Plaintiffs filed an amended complaint. Kasparov brings six causes of action against the defendants, alleging fraud and deceit (Count One), conspiracy to commit fraud (Count Two), breach of fiduciary duty (Count Three); unjust enrichment (Count Four); breach of contract (Count Five); and promise causing detrimental reliance[4] (Count Six). Aleph, in turn, brings two causes of action against Ambit, alleging breach of contract (Count Seven) or, in the alternative, unjust enrichment (Count Eight). Kasparov and Aleph seek compensatory and punitive damages.

On December 7, 2012, Defendants moved to dismiss the amended complaint. First, they contend that the plaintiffs have failed to properly plead diversity jurisdiction and, thus, the complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Second, the individual defendants – Chambless and Thompson – move to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction. Last, the defendants move to dismiss pursuant to Rule 12(b)(6) for failure to state a claim. Oral argument on the motion was heard on January 18, 2013. For the reasons that follow, defendants' motion is granted in part and denied in part.

DISCUSSION

A.      *Rule 12(b)(1) Motion to Dismiss* (*Subject Matter Jurisdiction*)

      1. *Governing Law*

---

[4] Kasparov refers to this cause of action as "promise causing detrimental reliance." Am. Compl. ¶¶ 219-222. In accordance with Federal Rule of Civil Procedure 8(e) – and the defendants' construction – I construe the complaint as asserting a claim of promissory estoppel, as Kasparov clearly intended. *See* Fed R. Civ. P. 8(e) ("pleadings must be construed so as to do justice").

5

Plaintiffs allege that this Court has diversity jurisdiction over the case. *See* 28 U.S.C. § 1332. A party premising federal jurisdiction on diversity of citizenship is required to include in its complaint adequate allegations of complete diversity. *See* Fed. R. Civ. P. 8(a)(1). Since a limited liability company is deemed to have the citizenship of each of its members, *see Handelsman v. Bedford Village Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000), a complaint must allege the citizenship of each member. A district court may order jurisdictional discovery where appropriate to assure itself that jurisdiction is proper. The showing necessary to order jurisdictional discovery "is committed to the sound discretion of the district court on a case-by-case basis without 'bright-line' limits." *Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 145 (E.D.N.Y. 2009) (citation omitted).[5]

Defendants move to dismiss, arguing that the allegations in the complaint are insufficient to allege complete diversity. Defendants' arguments raise both a facial and a factual challenge to this Court's jurisdiction. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (noting that, when evaluating a motion to dismiss under Rule 12(b)(1), the court must distinguish between facial and factual challenges to jurisdiction). A facial challenge attacks "the sufficiency of the jurisdictional facts alleged, not the facts themselves." *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 887 n.15 (2d Cir. 1996). In contrast, a factual challenge disputes the accuracy of the facts alleged in the complaint or otherwise suggests that the district court in fact lacks subject matter jurisdiction. *Robinson*, 269 F.3d at 140. When a factual challenge to jurisdiction is raised, the party asserting jurisdiction has the burden of proving the alleged jurisdictional facts with "competent proof." *See Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998). In contrast, in a facial challenge, the allegations in complaint are accepted as true.

---

[5] Courts in the Second Circuit have exercised this jurisdiction to both grant and deny jurisdictional discovery. *See, e.g.*, *Sourceone Healthcare Tech., Inc. v. Bensonhurst Imaging Assoc. Mgmt. LLC*, 08 Civ 2568 (BMC) 2008 WL 2697324, *3 (E.D.N.Y. July 2, 2008) (denying motion for jurisdictional discovery where the plaintiff had "no idea as to the identity of all the members and partners" of the defendant organization); *Straub Inv., Ltd. v. Tirakian*, 05 Civ 3299, 2007 WL 295600, *1 (E.D.N.Y. Jan. 29, 2007) (dismissing a case for lack of subject matter jurisdiction after limited discovery revealed a lack of complete diversity).

2. *Analysis*

a. *Facial Challenge to Individual Defendants' Citizenship*

Plaintiffs allege, "upon information and belief," that defendants Chambless and Thompson are "citizen[s] of Texas" and reside in Dallas and Austin respectively. Am. Compl. ¶¶ 11, 13. Defendants argue that allegations based on "information and belief" are insufficient as a matter of law to invoke federal jurisdiction. Since defendants do not dispute the factual accuracy of the individual defendants' citizenship, I accept these allegations as true. Thus, I find that the complaint alleges diversity of citizenship with respect to the individual defendants.[6]

b. *Factual Challenge to Corporate Defendant's Citizenship*

Unlike the facial challenge discussed above, the defendants raise a factual challenge to the alleged citizenship of the entity defendant, Ambit. Plaintiffs allege, "[u]pon information and belief," that defendant Ambit is a Texas limited liability corporation and that it has the citizenship of its sole member, Ambit GenPar. Inc. *Id.* ¶ 8. In support of this allegation, plaintiffs attach a copy of Ambit's certificate of formation filed with the office of the Secretary of State of Texas, which lists Ambit Energy, L.P. as Ambit's initial and managing member. *Id.*, Ex. 1. Ambit Energy, L.P., in turn, is alleged to be comprised of one general partner, Ambit GenPar., Inc. The certification of formation attached to the complaint indicates that Ambit GenPar is a Texas corporation. Relying on these exhibits, plaintiffs allege "upon information and belief" that Ambit GenPar Inc. is the "sole member" of Ambit and, as a result, Ambit is a citizen of Texas. *Id.* ¶ 9-10.

Defendants dispute the accuracy of these jurisdictional allegations. They assert that Ambit GenPar is not its "sole member," and that "Ambit has multiple members," including limited partners. Def. Mem. of Law 5, ECF No. 20. Defendants further argue that dismissal – not jurisdictional discovery into the identities of the limited partners, as plaintiffs request – is the

---

[6] Defendants also confirm their citizenship in papers filed in support of this motion. See Decl. of Chris Chambless ¶ 6, ECF No. 21 ("I am a citizen of the State of Texas"); Decl. of Steven Thompson ¶ 6, ECF No. 22 (same).

7

proper remedy. Permitting limited discovery would, according to defendants, reward plaintiffs for their failure to conduct the pre-filing investigation contemplated by Rule 11 of the Federal Rules. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (recognizing that "the central purpose of Rule 11 is to deter baseless filings in District Court and thus . . . streamline the administration and procedure of the federal courts.").

As the party asserting jurisdiction, the plaintiffs bear the burden of establishing jurisdiction by a preponderance of the evidence. *Hoffritz for Cutlery Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985). Plaintiffs fail to provide any "competent proof" sufficient to overcome defendants' factual challenge. However, I conclude that plaintiffs have made a good faith effort to allege the citizenship of the entity defendant. Indeed, defendants' counsel admitted at oral argument that "the citizenship of Ambit Texas, LLC is very complicated," Tr. of Oral Arg., at 7:1. Thus, I conclude that limited discovery is necessary to ascertain whether Ambit does, in fact, have limited partners and – if so – the citizenship of these limited partners. *Cf. Strategem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547-48 (S.D.N.Y. 1994) (ordering limited discovery into personal jurisdiction where there is a "sufficient start toward establishing" jurisdiction and the position is not frivolous); *see also Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan*, 582 F.3d 393, 401 (2d Cir. 2009) (stating that "[a] district court has wide latitude to determine the scope of discovery") (internal quotation marks omitted). As this discovery is not overly burdensome, I conclude that it is well within the scope of my discretion to order it.

B.  *Rule 12(b)(6) Motion to Dismiss (Failure to State a Claim)*[7]

    1. *Governing Law*

---

[7] The Ambit Agreement provides that "any claim, dispute, or other difference between [consultants] and Ambit Companies, or among [consultants] and Ambit Companies, shall be exclusively resolved by binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association . . ." Ambit Agreement ¶ 9. Since defendants don't move to compel arbitration, I consider the merits of the alleged claims.

8

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint. *See, e.g.*, *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). The issue it raises is not whether the plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. *Id.* In reviewing a motion to dismiss, the court accepts the factual allegations in the complaint as true, *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (*per curiam*), and draws all reasonable inferences in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995). Facts that "give the defendant fair notice of what the claim is and the grounds upon which it rests" meet the 12(b)(6) standard. *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

2. *Analysis*

   a. *The Motion to Dismiss the Breach of Contract Claims*

In Counts Five and Seven, Kasparov and Aleph seek damages for Ambit's breach of contract. The elements of a cause of action for breach of contract in New York[8] are: (1) formation of a contract between the parties: (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage. *Palmetto Partners LLP v. AJW Qualified Partners, LLC*, 83 A.D.3d. 804 (2d Dep't 2011). Defendants argue that the contract claim must be dismissed because the amended complaint does not allege facts sufficient to support the existence of a valid contract between Ambit and plaintiffs and fails to allege the specific terms of the contract. As set forth below, I disagree and conclude that the complaint alleges (1) a written agreement between plaintiffs and Ambit and (2) a collateral oral agreement between Kasparov and Thompson; and (3) breach of the terms of these agreements.

---

[8] Defendants cite to and rely on New York law in support of their motion to dismiss. *See, e.g.*, Defs.' Mem. of Law 13. Plaintiffs don't dispute that New York law governs this appeal. However, I note that the Ambit Agreement, Am. Compl. Ex. 2, contains a provision in which the parties agree to decide any dispute according to the laws of the State of Texas, *see* Ambit Agreement ¶ 9. In light of the parties' decision to rely on New York law, I do so as well. I have no reason to believe that my decision would be any different were Texas law to apply.

i. *The Existence of a Contract*

The parties dispute whether plaintiffs have alleged the existence of a valid, enforceable contract and, if so, whether the contract is oral or written. To resolve this question, I examine the pleadings; for purposes of a motion to dismiss, the pleadings include not just the four corners of the complaint, but also any written instrument attached to it as an exhibit. *See DeLuca v. AccessIT Grp., Inc.*, 695 F.Supp.2d 54, 59 (S.D.N.Y. 2010). Where, as here, a copy of a contract is attached to the complaint, the text of the document controls in the event of a contradiction between the pleading and the exhibit. *See Rapoport v. Asia Electronics Holding Co.*, 88 F.Supp.2d 179, 184 (S.D.N.Y. 2000); *see also Schwartzman v. Weintraub*, 43 A.D.2d 683, 683 (1st Dep't 1973) (holding that, where the allegations in the complaint differ from the terms of the written agreement, it is the written agreement – and not the description of it in the pleadings – that controls); *Queen v. Benesch*, 191 A.D. 83, 84 (1st Dep't 1920) (same). Plaintiffs attach copies of the Ambit Agreement, the Ambit Policies & Procedures, and the Ambit Compensation Plan to the complaint, *see* Am. Compl., Ex. 2-4, and allege that these exhibits outline the scope of Ambit's contractual duties. *Id.* ¶ 50. Thus, I look to these exhibits – together with the complaint's allegations as a whole – to evaluate the allegation of an agreement between Ambit and plaintiffs.

Turning to the complaint, plaintiffs allege that they "formal[ly] sign[ed] up" to become Ambit consultants, *id.* ¶ 48, to be "compensate[ed] . . . in accordance with the Ambit standard compensation plan," *id.* ¶ 214, and filled out an "on-line agreement," *id.* ¶ 79. The complaint also alleges that plaintiffs entered into "an oral agreement to become Ambit's consultant," *see id.* ¶¶ 214, 225. In light of the exhibits and the allegations as a whole, the only reasonably construction of the complaint is that it alleges a written agreement between plaintiffs and Ambit.

10

The complaint also alleges that Kasparov entered into a separate oral agreement with Thompson; specifically, it alleges that Thompson orally agreed to optimize Kasparov's downline in Kasparov's best interest in return for Kasparov's decision to sign up under Thompson's downline.[9] Kasparov further alleges that Ambit has a contractual duty pursuant to the Ambit compensation plan to pay him as if his downline had been configured as promised. Drawing all inferences in Kasparov's favor, I conclude that the complaint alleges (1) written agreement between plaintiffs and Ambit and (2) a collateral oral agreement between Kasparov and Thompson.[10]

## ii. *The Breach*

Defendants argue that the complaint fails to allege with specificity the contractual terms that Ambit is alleged to have breached. A breach of contract claim will be dismissed where a plaintiff fails to allege "the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated." *Martinez v. Vakko Holding A.S.*, No. 07 Civ. 3413(LAP), 2008 WL 2876529, at *2 (S.D.N.Y. July 23, 2008). Looking to the allegations in the complaint and drawing all inferences in plaintiffs' favor, Kasparov and Aleph have alleged the essential terms of the written contract with Ambit. The exhibits provide the terms of the written contract. Although the Ambit Compensation Plan attached to the complaint is lacking in specifics as to the compensation scheme, for purposes of this motion, the facts as alleged in the complaint are assumed true. Thus, I assume that this exhibit reflects a complete and accurate copy of the Ambit Compensation Plan provided to consultants. Likewise, the complaint

---

[9] The allegations are insufficient to allege an oral contract with Chambless. The complaint alleges solely that Chambless told Kasparov that Thompson is trustworthy, Am. Compl. ¶ 28, and includes a conclusory assertion "based on information and belief" that Thompson was not able to arrange Kasparov's downline without help from Chambless. Allegations devoid of any factual specificity are insufficient to state a claim. Accordingly, Kasparov's breach of contract claim is dismissed against Chambless.

[10] I am unpersuaded by defendants' argument that the complaint fails to allege that Chambless and Thompson had either actual or apparent authority to bind Ambit. Under New York law, "actual authority is created by direct manifestations from the principal to the agent," *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997) (internal quotation marks omitted). "Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Id.* at 1088 (internal quotation marks omitted). The allegations in the complaint are sufficient to allege that the defendants were cloaked with, at a minimum, apparent authority to bind Ambit.

lays out the terms of the oral agreement that Thompson made with Kasparov and alleges with specificity that these promises were breached in a manner that caused monetary and reputational damage.

Accordingly, defendants' motion to dismiss plaintiffs' breach of contract claims is denied.[11]

### b. *The Motion to Dismiss the Fraud and Conspiracy Claims*

In Counts One and Two, Kasparov alleges that Thompson and Chambless, acting in concert, perpetrated a fraud by misrepresenting that Thompson intended to optimize Kasparov's downline in order to induce Kasparov to sign up as an Ambit consultant under Thompson's downline. Am. Compl. ¶¶ 181-199. A claim predicated on a breach of a contractual arrangement "cannot be converted into a fraud claim simply by allegations that a defendant never intended to adhere to its obligations under the agreement." *Carlucci v. Owens-Corning Fiberglas Corp.*, 646 F.Supp. 1486, 1491 (E.D.N.Y. 1986). Rather, "to sustain a tort action separate from the breach of contract claim, the tortious conduct must have breached a legal duty existing independently of the contractual relations between the parties." *Crabtree v. Tristar Automotive Group, Inc.*, 776 F.Supp. 155, 162 (S.D.N.Y. 1991) (citation omitted).

Where, as here, the fraud claim was based on an agreement integrated into the contract, a fraud claim cannot be maintained simultaneously with the breach of contract claim. *See Town of Haverstraw v. Columbia Elec. Corp.*, 237 F.Supp.2d 452, 457 (S.D.N.Y. 2002). Thompson's duty to optimize Kasparov's downline is the same as the duty arising under the oral contract between them. Because Kasparov does no more than allege that Thompson never intended to honor the oral agreement to optimize his downline, the fraud claim alleged in Count One is dismissed against Thompson as duplicative of the contract claim.

---

[11] The complaint alleges only that Ambit breached the written contract, Am. Compl. ¶ 216, and plaintiffs have not alleged that Chambless or Thompson signed a contract in their individual capacity, or that their name appeared anywhere in any writing, or that they verbally represented an intention to assume personal liability. Thus, to the extent plaintiffs seeks to impose individual liability on Thompson and Chambless for Ambit's alleged breach of contract, this claim is dismissed.

The allegations in the complaint are insufficient to allege a fraud claim against Chambless. A conclusory allegation that Chambless was "aware of Thompson's plans and was helping him," Am. Compl. ¶ 185, is not – without more – sufficient to state a fraud claim. Thus Count One is dismissed against Chambless.[12]

c. *The Motion to Dismiss the Unjust Enrichment Claim*

In Counts Four and Eight, plaintiffs assert causes of action sounding in unjust enrichment, as an alternative to its remedy in contract. Unjust enrichment is a "quasi-contractual remedy that the law provides where a contractual relationship has legally failed." *Berman v. Sugo LLC*, 580 F.Supp.2d 191, 210 (S.D.N.Y.2008) (citing *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir.2006)). Since, as discussed above, plaintiffs have alleged an express contract for services with Ambit and a separate express (albeit oral) contract for services with Thompson, they may not also seek recovery in quasi contract.[13] Accordingly, plaintiffs' unjust enrichment claims are dismissed. *See Singer v. Xipto Inc.*, 852 F.Supp.2d 416, 426 (S.D.N.Y. Mar. 20, 2012) (stating that "[w]hile a party generally may not simultaneously recover upon a breach of contract and unjust enrichment claim arising from the same facts, it is still permissible to plead such claims as alternative theories.").[14]

d. *The Motion to Dismiss the Promissory Estoppel Claim*

In Count Six, Kasparov alleges a claim of promissory estoppel against Ambit based on Ambit's promise to launch operations in Illinois within a specific time frame and the failure to do so. A cause of action for promissory estoppel requires a plaintiff to prove three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that

---

[12] As the fraud allegations fail, so too does the allegation of a conspiracy to commit fraud. Thus, Count Two also is dismissed against all defendants.

[13] The complaint alleges, upon information and belief, that Thompson shared with Chambless the benefits Thompson derived from optimizing Kasparov's downline for his own benefit. Am. Compl. ¶ 74. This bare allegation is lacking in factual specificity and, as such, is insufficient to state a claim. For this reason, the unjust enrichment claim is dismissed against Chambless.

[14] There are circumstances in which an unjust enrichment claims may co-exist with a contract claim, *see Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F.Supp.2d 296, 305 (E.D.N.Y. 2010), but those circumstances are not met here.

13

promise; and (3) injury to the relying party as a result of the reliance. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). Defendants don't dispute that the complaint plausibly alleges a clear and unambiguous promise, reliance, and injury.[15] Instead, they assert (in one sentence) that this claim "fails as a matter of law" because plaintiffs have not alleged the facts necessary to establish that either Chambless or Thompson had actual or apparent authority to make a promise that binds Ambit. Def. Mem. at 25. This argument is unpersuasive. Kasparov alleges that Thompson made a "public[] promise[]" during an event at the Sheraton hotel in Flushing, New York that the launch in Illinois would start on a specific date. *Id.* ¶ 150. This allegation is sufficient to allege that Ambit cloaked Thompson in apparent authority to make promises on its behalf. *See supra* note 10. Accordingly, the motion to dismiss this cause of action against Ambit is denied.

e. *The Motion to Dismiss the Breach of Fiduciary Duty Claim*

In Count Three, Kasparov alleges that Thompson was in a fiduciary relationship with him and, as such, owed him a duty of loyalty and then breached that duty. Am. Compl. ¶¶ 200-203. To state a claim for a breach of fiduciary duty, a plaintiff must allege: "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Rut v. Young Adult Inst., Inc.*, 74 A.D.3d 776, 777 (2d Dep't 2010). It is well established that a conventional business relationship, without more, is insufficient to create a fiduciary relationship. *See AHA Sales, Inc. v. Creative Bath Prods., Inc.*, 58 A.D.3d 6, 21 (2d Dep't 2008). Here, Kasparov alleges no more than a contractual relationship between the parties. Indeed, the complaint utilizes contract language to describe Kasparov's relationship with Thompson. Am. Compl. ¶ 201 ("[B]y undertaking upon himself to arrange Kasparov's downline

---

[15] Kasparov alleges that Ambit – through Chambless and Thompson – "made a clear and unambiguous promise to Kasparov to launch its operations in the State of Illinois within thirty days of the pre-launch and that the rules of such operation would be identical to the rules in New York." Am. Compl. ¶ 220. Kasparov relied on this promise by personally traveling to Chicago at least ten times and "utiliz[ing] all his connections bringing on board . . . about an 800 person team," *id.* ¶ 151, and that he suffered injury in the form of "lost . . . opportunity to earn in Illinois," and reputational harm. *Id.* ¶ 159.

for Kasparov, as Kasparov's *consideration* to join Thompson's downline, Thompson became Kasparov's fiduciary, thus owing him a duty of loyalty in configuring his downline.") (emphasis added). Even construing the complaint to draw every favorable inference in Kasparov's favor, I conclude that it fails to set forth facts which, if proven, would demonstrate that Thompson had anything but a business relationship with Kasparov. Accordingly, defendants' motion to dismiss this cause of action is granted.

C.   *Personal Jurisdiction*

Thompson[16] seeks dismissal of the claims against him for lack of personal jurisdiction. Once a defendant challenges a court's exercise of personal jurisdiction, plaintiff bears the burden of establishing that jurisdiction is indeed proper. Where, as here, the court relies solely on the pleadings and affidavits to determine the existence of jurisdiction, the plaintiff must make a *prima facie* showing of jurisdiction in order to defeat the motion.[17] *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). To make such a *prima facie* showing, plaintiffs must allege facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant. *Id.* (internal quotation marks omitted).[18] In diversity cases, district courts first court must determine whether there is jurisdiction over the defendant under the relevant forum state's laws, which in this case is New

---

[16]   As there are no remaining claims against Chambless, I consider this argument only as it relates to Thompson.

[17]   There are two types of personal jurisdiction: general and specific. General jurisdiction is authorized where the defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011). A court asserts "general jurisdiction" over a defendant when the court is permitted to "hear any and all claims against" that defendant. *Id.* In contrast, specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (internal quotation marks and brackets omitted). Such jurisdiction is "confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* (internal quotation marks omitted). In New York law, there are two statutory bases for personal jurisdiction over out-of-state defendants: (1) general jurisdiction pursuant to CPLR 301 ("section 301"), and (2) long-arm jurisdiction pursuant to CPLR 302 ("section 302"). The plaintiffs do not allege that Chambless and Thompson are subject to general personal jurisdiction in New York. They argue only that Thompson is subject to specific personal jurisdiction under New York's long-arm statute, *see* N.Y. C.P.L.R. § 302(a).

[18]   Even if such a *prima facie* showing is made, "[e]ventually personal jurisdiction must be established by a preponderance of the evidence, either at an evidentiary hearing or at trial." *See, e.g.*, *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993); *Bohn v. Bartels*, 620 F.Supp.2d 418, 424 (S.D.N.Y. 2007).

15

York.  Second, the court must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements.[19]

Plaintiffs' contend that personal jurisdiction is properly based on Thompson's tortious activity.  However, as discussed above, the only remaining claim against Thompson is a contract claim.  Kasparov has alleged that Thompson induced Kasparov to enter into a contract to supply services in New York while at a dinner meeting in New York.  In reliance on the promises made at this dinner in New York City, Kasparov agreed to sign up under Thompson's downline.  *See* Am. Compl.  ¶¶ 34-36, 39, 47-49.  The complaint alleges that Thompson continued to make trips to New York to recruit consultants and to bolster his own downline.  Thus, I am satisfied that Thompson's alleged contacts with New York were *prima facie* purposeful and that the breach of contract claim against him arose out of these purposeful New York contacts.  *See* N.Y. C.P.L.R. § 302(a)(1).

There is no doubt that the requirements of due process are met here.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471 (1985) (noting that, where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum and the litigation results from alleged injuries that "arise out of or relate to" those activities).  The complaint alleges that Thompson purposefully availed himself of the privilege of doing business in New York and engaged in a business to sell energy in New York.  These allegations are sufficient at this stage of the proceedings to satisfy due process.

D.     *Conclusion*

---

[19] The due process inquiry has two separate components: the "minimum contacts" inquiry and the "reasonableness" inquiry.  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).  The "minimum contacts" inquiry requires us to consider "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction."  *Id*.  The "reasonableness" inquiry requires us to decide "whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice."  *Id*. (internal quotation marks omitted).

      For the foregoing reasons, the motion to dismiss is granted in part and denied in part. The following claims survive this motion: breach of contract against Ambit and Thompson (Counts Five and Seven) and a promissory estoppel claim against Ambit (Count Six). The remaining claims are dismissed against all defendants.

      So ordered.

                                                      John Gleeson, U.S.D.J.

Dated: August 23, 2013
      Brooklyn, New York